# Illinois Official Reports

## Appellate Court

<div style="border:1px solid">

## *Ghiles v. Municipal Officers Electoral Board*, 2019 IL App (1st) 190117

</div>

| | |
|---|---|
| Appellate Court Caption | SEBASTIAN CALVIN GHILES, Petitioner-Appellant, v. THE MUNICIPAL OFFICERS ELECTORAL BOARD OF THE CITY OF CHICAGO HEIGHTS; WANDA ROGERS, in Her Official Capacity as Substitute Chairman of the Municipal Officers Electoral Board of the City of Chicago Heights; LORI WILCOX, in Her Official Capacity as Member of the Municipal Officers Electoral Board of the City of Chicago Heights; VINCENT ZARANTI, in His Official Capacity as Member of the Municipal Officers Electoral Board of the City of Chicago Heights; MICHAEL A. STEBEL, Objector; and RUBEN REYNOSO, Objector, Respondents-Appellees. |
| District & No. | First District, First Division<br>Docket No. 1-19-0117 |
| Filed | February 8, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2018-COEL-000034; the Hon. Carol Kipperman, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | McStephen O.A. Solomon, of Hazel Crest, for appellant.<br><br>Luciano Panici Jr., of Law Offices of Dennis G. Gianopolus, P.C., of Lansing, for appellees Municipal Officers Electoral Board of the City of Chicago Heights, Wanda Rodgers, Lori Wilcox, and Vincent Zaranti. |

Matthew M. Welch, Matthew T. Ingersoll, and Erin E. Blake, of Montana Welch, LLC, of Palos Heights, for other appellees.

Panel          PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Griffin and Walker concurred in the judgment and opinion.


## OPINION

¶ 1       Petitioner, Sebastian Calvin Ghiles, filed nomination papers to be a nonpartisan candidate for the office of mayor of Chicago Heights, Illinois. Objections were filed to Mr. Ghiles's nomination papers. After a hearing, the Municipal Officers Electoral Board of the City of Chicago Heights (Board) invalidated Mr. Ghiles's nomination papers because he did not have the required minimum number of signatures. The circuit court affirmed the Board's determination. Mr. Ghiles now challenges the Board's decision, arguing that the Board's chosen methodology used to invalidate his papers was "not fair, reasonable, or rational." For the following reasons, we affirm the decision of the Board.

¶ 2                               I. BACKGOUND

¶ 3       Mr. Ghiles filed his nomination papers on November 20, 2018. These papers consisted of 81 pages of signatures—with a maximum of 10 signatures per page—in support of placing Mr. Ghiles on the ballot for the consolidated mayoral primary to be held on February 26, 2019.

¶ 4       On December 3, 2018, Michael A. Stebel and Ruben Reynoso (collectively, the objectors) jointly filed objections to Mr. Ghiles's nomination papers on several grounds. They alleged that some of the entries contained forged or duplicative signatures, referenced nonregistered voters, and contained incomplete or inaccurate voter information. They also argued that the signature pages as a whole "demonstrate[d] a pattern of fraud and disregard of the Election Code" such that "every sheet circulated *** [was] invalid." The objectors maintained that Mr. Ghiles could not be listed on the ballot because his papers "contain[ed] less than 139 validly collected signatures of qualified and duly registered legal voters of the City of Chicago Heights."

¶ 5       Section 10-9 of the Illinois Election Code (10 ILCS 5/10-9(3) (West 2016)) provides that a municipal officers electoral board shall convene to hear objections to nomination papers for municipal office and that the board consists of the mayor, the city clerk, and the member of the city council with the longest tenure. Because Mr. Ghiles was running for mayor, the mayor did not participate in consideration of these objections, and that Board position went to the next-highest tenured city council member. The Board gave Mr. Ghiles and the objectors written notice on December 6, 2018, that a hearing would be convened beginning on December 11, 2018, to consider the objections to Mr. Ghiles's signatures.

¶ 6       Pursuant to section 10-3 of the Election Code, Mr. Ghiles needed a minimum of 139 valid signatures (5% of the voters in the last applicable election) to be placed on the ballot, and the

Board was only to review a statutory maximum of 221 signatures (8% of voters in the last election). *Id.* § 10-3. The statute provides in pertinent part as follows:

> "Nominations *** may be made by nomination papers signed in the aggregate for each candidate by qualified voters of such district, or political subdivision, equaling not less than 5%, nor more than 8% (or 50 more than the minimum, whichever is greater) of the number of persons, who voted at the next preceding regular election in such district or political subdivision in which such district or political subdivision voted as a unit for the election of officers to serve its respective territorial area." *Id.*

¶ 7 Section 10-10 of the Election Code (*id.* § 10-10) requires an electoral board, on the first day of its convening, to "adopt rules of procedure for the introduction of evidence and the presentation of arguments." The Board proposed such draft rules of procedure in its notice to the parties, including Rule 8, which establishes a procedure for considering a prospective candidate's papers when, as Mr. Ghiles did, the candidate has submitted more than the statutory maximum. Rule 8 provides, in pertinent part:

> "In case a candidate *** files a petition or petitions in excess of the maximum number of signatures and an objection is filed pursuant to Section 10-8 of the Election Code, for efficiency and administrative convenience, the Electoral Board shall disregard that number of signatures presented as are in excess of the statutory maximum beginning by counting from the first signature of the first page of the filing. Thus, if a candidate *** files petitions subject to a statutory maximum of 500 signatures but they present 700, the first 200 signatures presented on their nomination papers shall be disregarded and the Electoral Board shall examine the last 500 signatures presented."

¶ 8 The Board met on December 11, 2018, with Mr. Ghiles present, and it acknowledged and adopted the draft rules of procedure, including Rule 8. The Board then submitted Mr. Ghiles's nomination papers to a records examination by the Cook County Clerk, which issued its report on December 18, 2018. The clerk's report details the total signatures submitted by Mr. Ghiles, the challenges to those signatures made by the objectors, which challenges were overruled and which were sustained, and the number of remaining valid signatures. Mr. Ghiles submitted 81 pages containing 736 signatures, 434 of which remained valid after the clerk's examination. The valid signatures were spread throughout the pages; on some pages there were no valid signatures and on others all 10 signatures were counted as valid.

¶ 9 The Board reconvened on December 21, 2018, for a hearing on the objections to Mr. Ghiles's petition. At that hearing, Mr. Ghiles first argued that the Board's method under Rule 8—of removing signatures submitted in excess of the statutory maximum from consideration by essentially taking those signatures off the top of the stack rather than from the bottom of the stack—was "*sua sponte*," "*ultra vires*," and unreasonable.

¶ 10 On December 28, 2018, the Board issued its written decision invalidating Mr. Ghiles's nomination papers. The Board noted that under Rule 8, "the relevant 8% [of signatures] to be reviewed by the Board would be the signatures from Sheet 52, Line 9, to the end of the Candidate's Petitions." After "accounting for the factual findings of the Cook County Clerk as it pertains to" those 221 signatures, the Board found that only 112 signatures were valid. The Board rejected the objectors' claim that the signatures revealed a "pattern of fraud" but nevertheless determined that, because Mr. Ghiles had failed to reach the statutory minimum of 139 valid signatures, his name should be stricken from the ballot for the February 26, 2019,

primary election.

## II. JURISDICTION

Mr. Ghiles sought judicial review, and the circuit court affirmed the Board's decision on January 17, 2019. Mr. Ghiles timely filed his notice of appeal on the same day. We have jurisdiction over this matter pursuant to section 3-112 of the Code of Civil Procedure (735 ILCS 5/3-112 (West 2016)), making final orders in administrative review cases reviewable by appeal as in other civil cases, and Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

## III. ANALYSIS

The sole issue in this case is whether the Board's method of removing from consideration those signatures in excess of the statutory minimum was rationally related to its interest in providing an orderly election procedure, when the Board disregarded the excess signatures at the front on the petition and reviewed the maximum number of signatures it could review from the back of the stack.

With respect to appeals in administrative cases, "we review the decision of the board, not the [circuit] court" (*Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 212 (2008)) and "may affirm an electoral board's decision on any basis that appears in the record, even though the electoral board may have relied on another basis to support its decision" (*Cunningham v. Schaeflein*, 2012 IL App (1st) 120529, ¶ 34). "An electoral board is viewed as an administrative agency" and "[t]hus, the standard of review is determined by the type of question on review." *Hossfeld v. Illinois State Board of Elections*, 238 Ill. 2d 418, 423 (2010). Findings and conclusions on questions of fact are deemed *prima facie* true and correct and will not be overturned unless they are against the manifest weight of the evidence, findings on mixed questions of law and fact will not be disturbed unless clearly erroneous, and questions of law are reviewed *de novo*. *Wilson v. Municipal Officers Electoral Board*, 2013 IL App (1st) 130957, ¶ 10.

"Administrative regulations, for purposes of determining their validity, are presumed to be valid" and will not be set aside unless "clearly arbitrary, unreasonable or capricious." *Begg v. Board of Fire & Police Commissioners*, 99 Ill. 2d 324, 331-32 (1984). "[T]he person questioning the validity of the administrative regulation bears the burden of establishing its invalidity." *Id.* at 332. We review the Board's method of removing excess signatures under this standard—whether it was arbitrary, unreasonable or capricious.

In any case involving the right to run for elected office, we must bear in mind certain principles. "[V]oting is of the most fundamental significance under our constitutional structure." *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). "Restrictions on access to the ballot burden two distinct and fundamental rights, the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." (Internal quotation marks omitted.) *Id.* In veneration of these intertwined rights, Illinois treats "access to a place on the ballot [as] a substantial right not lightly to be denied." *Bettis v. Marsaglia*, 2014 IL 117050, ¶ 28.

¶ 18    As noted above, section 10-3 of the Election Code requires that Mr. Ghiles present a nominating petition that includes valid signatures from at least 5% of the people that voted in the last election for the mayoral office he was seeking. That statute also limits, to 8% of those who voted in that last election, the number of signatures Mr. Ghiles can submit to the Board in the effort to achieve this necessary quota of valid signatures.

¶ 19    Both parties in this case rely on the same two cases that have examined this limitation on the number of signatures a candidate is allowed to submit to the Board: *Richards v. Lavelle*, 620 F.2d 144, 147 (7th Cir. 1980), and *Wilson*, 2013 IL App (1st) 130957.

¶ 20    In *Richards*, the Seventh Circuit recognized that an electoral board's enforcement of a statutory maximum limitation of signatures "imposes no significant burden on anyone" because it simply requires the candidate offering nominating signatures to count. *Richards*, 620 F.2d at 147. However, that court held that the sanction of removing the candidate from the ballot because he submitted more than the maximum number of signatures was an irrational, and therefore unconstitutional, means of enforcing that limitation. *Id.* at 148.

¶ 21    In *Wilson*, this court also recognized that limiting the maximum number of signatures was a limitation that "served a legitimate state interest." *Wilson*, 2013 IL App (1st) 130957, ¶ 14. In that case, we found that election board's rule of considering signatures—starting at the top of the nominating petitions and continuing only until it had examined the statutory maximum—was "a rational means of enforcing the statutory maximum imposed." *Id.*

¶ 22    Mr. Ghiles asks us to reverse the Board's decision here and order his name be placed on the ballot because "the Board's action and method in this case [invalidating] his nomination papers *** was not fair, reasonable, or rational." He makes several arguments.

¶ 23    He first argues the Board acted beyond its authority by relying on paragraph 12 of the objector's petition, in which they stated that "[t]he Nomination Papers contain petition sheets which contain signatures of voters well in excess of that number provided for by law" and were therefore invalid. Mr. Ghiles correctly notes that, under *Richards*, 620 F.2d at 148, an electoral board cannot invalidate a candidate's nomination papers simply because they exceeded the maximum signature requirement. He insists that "[t]he inquiry and prosecution of this allegation should have ended there" but that the Board "acted *sua sponte*, and *ultra vires*, by counting out signatures" after the Cook County Clerk's records examination to find that, of the 221 signatures that the Board examined, only 112 were valid.

¶ 24    However, there was nothing *sua sponte* or *ultra vires* about the Board's actions. Under section 10-3 of the Election Code (10 ILCS 5/10-3 (West 2016)), the Board is empowered to limit its review to 8% of persons "who voted at the next preceding regular election" for that office, and under *Richards* and *Wilson*, it is vested with discretion to craft a rational way of separating that 8% from the total number of signatures a candidate has submitted. That is what the Board did here.

¶ 25    Mr. Ghiles also challenges the Board's method of complying with the statute, arguing both that Rule 8 is inherently contradictory and that, as interpreted by the Board, Rule 8 is arbitrary and capricious.

¶ 26    Mr. Ghiles does not disagree that the hypothetical posed in Rule 8 clearly anticipates that the Board will draw from the bottom of the candidate's proffered stack of nominating petitions until it has reached the maximum number. Mr. Ghiles argues that the portion of the rule preceding the hypothetical—which states that "the Electoral Board shall disregard that number

of signatures presented as are in excess of the statutory maximum beginning by counting from the first signature of the first page of the filing"—contradicts this reading.

¶ 27 We find no contradiction. The first statement provides that the Board will determine whether signatures *exceed* the maximum "by counting from the first signature of the first page," and the hypothetical that follows separately provides the method for determining which of those signatures the Board will consider. Preventing any ambiguity, Rule 8 offers a clarifying hypothetical that the signatures reviewed will be drawn from the bottom of the stack, meaning that those signatures exceeding the maximum at the top of the stack—starting at page one, line one—will be disregarded.

¶ 28 Mr. Ghiles also argues that, under this interpretation, the rule the Board promulgated and applied defies reason, in that "[r]eason would *** suggest and posit that extracting 221 signatures from 736 signatures would mean counting out the 221 signatures starting from signature #1 on sheet #1" and disregarding "the 'excess' of 221 *** once #221 is reached." In Mr. Ghiles's reading, the word "excess" can only have one meaning, and any notion that an excess could *precede* the signatures to be counted is an arbitrary scheme that improperly deprives him of ballot access.

¶ 29 We certainly agree that Mr. Ghiles's suggestion is a rational one, and it is the methodology we approved in *Wilson*. But, in our view, there is more than one rational method for adhering to the statutory limitation. It is rational to remove or disregard excess signatures either from the top (as in this case) or from the bottom (as in *Wilson*) of the stack of signatures provided where, as in this case, a candidate chooses to present the Board with more than the maximum number of signatures allowed.

¶ 30 An evil that clearly must be avoided is the possibility that an election board will use the process of identifying "excess" signatures as a ruse for eliminating "good" signatures so as to hamper a candidate seeking a place on the ballot. Nothing in the record suggests Rule 8 was promulgated to do that, and Mr. Ghiles does not dispute that the rule was promulgated and provided to him before any records examination was performed. Indeed, Mr. Ghiles made no objection to the rule when he was announced, likely because he also had no idea whether it would help him or hurt him more than if the Board had disregarded signatures from the bottom. In fact, a careful review of the record shows that the invalid signatures were spread throughout the 81 pages that Mr. Ghiles presented to the Board.

¶ 31 While Mr. Ghiles argues that if the Board had instead reviewed the *first* 221 signatures, he would have been over the 5% minimum threshold, nothing in the record suggests that the Board knew this. More importantly, this fact does not automatically render every other method of review, including that in Rule 8, irrational or unrelated to the Board's legitimate interest in conducting an orderly election. See *Wilson*, 2013 IL App (1st) 130957, ¶ 14.

¶ 32 The objectors and the Board both raise arguments of *laches* and waiver, claiming prejudice from Mr. Ghiles's failure to raise his objection to the signature counting process in Rule 8 until December 21, 2018. We need not address these arguments, however, as we find that the method set out in Rule 8 is not arbitrary and capricious.

¶ 33 IV. CONCLUSION

¶ 34 For the foregoing reasons, we affirm the decision of the Board.

¶ 35        Affirmed.